HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NAIRA OGANESSOVA,

    Plaintiff,

    v.

MUTUAL OF OMAHA LIFE INSURANCE COMPANY,

    Defendant.

CASE NO. C13-1443RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' motions for summary judgment. No party requested oral argument. For the reasons stated below, the court DENIES Defendant's motion for summary judgment (Dkt. # 17) and DENIES Plaintiff's motion for partial summary judgment (Dkt. # 19). The court orders the parties to file motions in limine in accordance with Local Rules W.D. Wash. LCR 7(d)(4), except that they shall file their motions no later than noon on November 13, they shall file oppositions no later than noon on November 20, and they shall note them for November 20 as well.

## II. BACKGROUND

Plaintiff Naira Oganessova has three disability insurance policies from Defendant Mutual of Omaha Life Insurance Company. Two of them are essentially identical long-term disability policies; another is a short-term injury-only disability policy ("STD Policy"). For ease of reference, the court will treat the two long-term disability policies as a single policy (the "LTD Policy") except where context demands otherwise.

ORDER – 1

Beginning in late June 2010, Ms. Oganessova contends that she has experienced persistent dizziness that has made it difficult to continue her employment as an interpreter and instructor for in-home caregivers.  She asserts that the dizziness and other complications forced her to limit her work hours from mid-2010 until February of this year, when she contends that she became totally unable to work.  She submitted a disability benefits claim to Mutual of Omaha in August 2010.  Mutual of Omaha denied that claim initially and after several requests for reconsideration.  Mutual of Omaha contends that Ms. Oganessova's dizziness is the result of an ear disorder for which the LTD Policy and STD Policy exclude coverage.  Ms. Oganessova contends that her dizziness is the result of a head injury she suffered in an accidental fall at her home on June 19, 2010, and that both Policies cover injury-induced disabilities.

To rule on these summary judgment motions, the court must discuss the evidence before it.  The court will do so only to the extent it is necessary to resolve those motions.  The parties have put a virtual mountain of evidence before the court, containing notes and reports from dozens of treating medical providers, non-treating medical providers, and medical providers retained solely for litigation, not to mention evidence from vocational specialists, purported "experts" in insurance practices, and at least one lawyer who Plaintiff's counsel believes can act as an expert witness.  That evidence serves largely to establish what the parties' motions do not acknowledge: the resolution of this case will depend on the resolution of disputed issues of material fact.  That is the province of the jury, not the province of the court on summary judgment.  The court has considered all of the parties' evidence, but it makes no attempt to mention all of it in this order.

**A.   Ms. Oganessova's Persistent Dizziness and First Six Months of Medical Treatment**

The court briefly summarizes the medical evidence relating to Ms. Oganessova's alleged disability, focusing on 2010, the year in which her dizziness manifested.  The parties should not misconstrue the summary as expressing any findings of fact.  On June

ORDER – 2

29, 2010, Ms. Oganessova called a nurse to report that she was experiencing a fourth day of dizziness, along with nausea and fatigue. She suspected that she had an ear infection, and on the following day she called the office of her otolaryngologist, Dr. David Mehlum, to request antibiotic ear drops. She had received treatment from Dr. Mehlum previously, relating to several issues with her ears. She had a cholesteatoma (a growth in the ear canal) removed, and had a perforated eardrum repaired as recently as 2007.

She did not see a medical provider for her dizziness until July 6, 2010, when she saw Dr. Geraldine Hashisaki, a family practice specialist. She reported two complaints: a sprain or break in her left great toe that occurred after a fall at her home 18 days earlier, and the persistence of dizziness and nausea. Dr. Hashisaki directed her to continue splinting her toe, and diagnosed her dizziness as vertigo arising from labyrinthitis, a condition involving swelling in the inner ear.

Her dizziness continued, prompting her to visit her regular family practitioner, Dr. Carol McCandless, who referred her to Dr. Mehlum. When she saw Dr. Mehlum on July 21, 2010, she reported that her dizziness had persisted for three weeks. Dr. Mehlum suspected vestibular neuritis, another inner ear condition, and ordered an MRI. The MRI was inconclusive.

She saw Dr. Noah Silver on September 1, 2010, again complaining of vertigo. Dr. Silver's notes contain this statement: "Vertigo – thinks she's had it for years, worse[] of late. 'constant'" His notes also contain this statement: "No head trauma." Mutual of Omaha portrays this as conclusive evidence that Ms. Oganessova denied experiencing head trauma, but the court disagrees. It is perhaps likely that Ms. Oganessova did not mention head trauma, but to assert that she "denied" head trauma is speculation at best.

At the recommendation of several of her physicians, including Dr. Mehlum, Ms. Oganessova saw Heather Morgenroth for vestibular rehabilitation treatment on September 24, 2010. Her notes contain the following statements: "Head trauma: no," and "Fall history last 6 months: yes 4 months ago and vertigo started about 10 days

ORDER – 3

later." Again, Mutual of Omaha asserts that Ms. Morgenroth's notes are conclusive proof that Ms. Oganessova denied head trauma. The court again disagrees.[1]

She saw Dr. McCandless again on October 27, 2010. Although she was there primarily for treatment for a rash, she "report[ed] intense frustration with her vertigo symptoms." Dr. McCandless's notes state that Ms. Oganessova "[h]as had vertigo for 4 mo[nths], ever since a fall (which did not involve loss of consciousness, but was a significant jarring by her history)." Ms. Oganessova requested a referral to a neurologist, and Dr. McCandless apparently made the referral after consulting with Dr. Mehlum.

On December 21, 2010, Ms. Oganessova saw Dr. Benjamin Podemski, a neurologist. His notes include the following statement:

> [Ms. Oganessova] had no symptoms of vertigo until the end of June, when she tripped at home. She hit the back of her head and neck. She was dazed and felt jarred but did not lose consciousness. She thought she might have fractured her toe and was somewhat immobilized as a result for several days but then noted positional and then persistent vertigo."

He observed that Ms. Oganessova walked with a "bizarre gait" in which she "would hold on to the wall in the hallway as she walked." He interpreted her gait as evidencing "histrionic tendencies." He also decided to treat her condition "as if [it were] a persistent post concussive syndrome with subjective vertigo."

Since 2010, a variety of medical providers, including several non-treating, non-examining physicians, have weighed in with assessments of the cause of Ms. Oganessova's vertigo, which apparently persists to this day. Some, like Dr. Mehlum, have attributed her condition to head trauma as a result of her fall at home. Others, like Dr. Lily Jung Henson (a physician offering expert testimony for Mutual of Omaha) have

---

[1] Mutual of Omaha and its counsel damage their credibility by omitting the second page of Ms. Morgenroth's September 24 notes, which is the page that relays Ms. Oganessova's "Fall history [in the] last 6 months," and declares that her "vertigo started about 10 days later." *Compare* Huber Decl. (Dkt. # 18), Ex. S (first page of Morgenroth notes) *with* Engle Decl. (Dkt. # 35), Ex. A at MUTUAL-000621-22 (both pages of Morgenroth notes, from Mutual of Omaha's claim file). To omit the second page once might be an accident; to consistently refuse to acknowledge the second page while focusing on the alleged "denial" of head trauma from the first page is more likely a breach of the duty of candor to the court.

ORDER – 4

attributed her condition to ear conditions that have no connection to the fall or only an incidental connection.

**B.    Ms. Oganessova's Unsuccessful Attempts to Obtain Disability Benefits from Mutual of Omaha**

While Ms. Oganessova sought treatment for her dizziness, she also sought benefits from Mutual of Omaha. She submitted the initial documents for a disability claim in August 2010. She complained of vertigo, but did not mention her fall or head trauma.

For various reasons, Mutual of Omaha did not receive Ms. Oganessova's medical records until February 2011. Dr. Timothy Tse, a psychiatrist who has worked exclusively for Mutual of Omaha since 2002, reviewed her records. After summarizing the medical history the court summarized above, he wrote as follows:

> The insured has a very long history of problems with her ears. She had a history of cholesteatoma and after it was removed, her dizziness improved.
>
> The vertigo/dizziness returned in June 2010. The records did not support any head injury. The post-concussive syndrome reported by Dr. Podemski was not credible and supported by the medical records.
>
> . . .
>
> The vertigo/dizziness was related to the diagnosis of vestibular neuritis. This is a condition related to the ear.

On March 7, 2011, Mutual of Omaha wrote to Ms. Oganessova to deny her claim. Its one-page letter stated that the LTD Policy "ha[d] an elimination for Disease or Disorder of the ear," and that "[u]pon completion of the medical review it was determined that your disability is due to the eliminated condition that is ridered on your policies." Mutual of Omaha did not mention the STD Policy.

By April 2011, Ms. Oganessova had hired an attorney, who asked Mutual of Omaha to reconsider its denial. His request included a one-paragraph letter from Dr. Podemski and Dr. Mehlum stating that as of March 2011, Ms. Oganessova was still experiencing dizziness as a result of post-concussive syndrome, and that both physicians had "excluded an[] inner ear related process" as the reason for her symptoms.

ORDER – 5

On May 16, 2011, Mutual of Omaha sent a second letter denying Ms. Oganessova's claim. This letter contained much more detail than the first, but arrived at the same conclusion. Mutual of Omaha rejected the assertion that her vertigo was the result of a head injury, and instead stated that the "medical evidence consistently documented vertigo and hearing loss which she has had several years." It again asserted that the "condition causing disability is related to her permanent elimination rider and excluded from coverage." There is no evidence that Mutual of Omaha performed any additional investigation between receiving Ms. Oganessova's request for reconsideration and issuing its second denial. There is no evidence that Mutual of Omaha requested additional input from a physician or anyone else with medical qualifications.

Ms. Oganessova continued to pursue her claim. Not until July 2013 did Mutual of Omaha obtain an opinion from an neurotologist,[2] Dr. James Andrews. It did so at the request of its own medical director, Dr. Thomas Reeder, who told Mutual of Omaha in November 2012 that a neurotologist should review the claim. M1060-61. Dr. Andrews did not share many of the opinions that Mutual of Omaha had relied on in rejecting Ms. Oganessova's claims. Unlike Mutual of Omaha, he did not contend that Ms. Oganessova had suffered from vertigo before June 2010. He opined that her fall in June 2010 "likely resulted in dislodging otoconia from the macule of the left inner ear causing a benign positional vertigo or canalithiasis." He thought that a "concussion or traumatic brain injury as the cause of her dizziness [was] possible but unlikely."

Mutual of Omaha relied on Dr. Andrews's opinion in its final denial letter, dated July 15, 2013. It contended that Dr. Andrews's diagnosis of dislodged otoconia in the middle ear was a diagnosis of an ear condition excluded from the LTD Policy.

Ms. Oganessova filed this lawsuit in August 2013. She alleged breach of the LTD Policy and the STD Policy, bad faith, and violation of Washington's Insurance Fair

---

[2] Neurotology is a subspecialty of otolaryngology focused on the study and treatment of neurological disorders of the ear.

ORDER – 6

Conduct Act ("IFCA," RCW 48.30.015). Both parties have moved for summary judgment. Mutual of Omaha asks the court to rule that Ms. Oganessova cannot, as a matter of law, prove any of her claims. Ms. Oganessova asks for partial summary judgment that she is disabled within the meaning of the Policies, that the Policies do not exclude her disability from coverage, and that Mutual of Omaha violated Washington insurance regulations in five ways.

## III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The parties request summary judgment on factual questions whose answers are intensely disputed. In particular, a jury could reach any of a number of conclusions as to the cause of Ms. Oganessova's injury, and the court must reject the parties' invitation for the court to resolve the factual disputes underlying that determination on summary judgment. Those factual disputes, however, are entwined with at least one legal dispute that the court *can* resolve on summary judgment. The parties' most critical legal dispute is over the effect of the LTD Policy's exclusion of coverage for diseases or disorders of the ear. The court now turns to that dispute.

ORDER – 7

### A. The LTD Policy Does Not Exclude Coverage for Disability Whose Efficient Proximate Cause Was Injury.

To decide the impact of the ear disease exclusion, the court must interpret the LTD Policy. In Washington, insurance policy interpretation is a legal question. *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002) ("Interpretation of insurance policies is a question of law, in which the policy is construed as a whole and each clause is given force and effect."). The court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id*. (internal quotation omitted). Terms defined within a policy are to be construed as defined, while undefined terms are given their "ordinary and common meaning, not their technical, legal meaning." *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246 (Wash. 1997). Dictionaries may assist in determining the ordinary meaning of a term. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990). If policy language on its face is fairly susceptible to two different but reasonable interpretations, ambiguity exists. *Peasley*, 932 P.2d at 1246 (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (Wash. Ct. App. 2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible."). Extrinsic evidence may provide the meaning of an ambiguous term, but only where that evidence shows that both parties to the policy intended a particular meaning. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Const. Co.*, 951 P.2d 250, 256 (Wash. 1998); *see also Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) ("If a clause is ambiguous, [a court] may rely on extrinsic evidence of the intent of the parties to resolve the ambiguity."). Because parties rarely negotiate the terms of an insurance policy, there is rarely evidence of the parties' mutual intent as to the meaning of a policy term. Where extrinsic evidence does not resolve an ambiguity, the court must construe the ambiguous term in favor of the insured. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 141 (Wash.

ORDER – 8

2000); *see also Hammonds*, 865 P.2d at 562 (directing courts to resolve ambiguity against insurer "even where the insurer may have intended another meaning").

The LTD Policy provides coverage for both "Total Disability," which is a complete inability to work, and "Proportionate Disability," which is a reduction in the ability to work resulting in lost income. M6-7.[3] The coverage clauses applying to each are materially identical. The Total Disability coverage clause states as follows:

> If you are Totally Disabled because of a Sickness or Injury, we will pay the Total Disability Monthly Benefit.

M7. The LTD Policy defines the capitalized terms:

> **Sickness** means your illness, disease, or physical condition which:
>
> (a)   causes loss beginning while this policy is in force; and
>
> (b)   is not excluded from coverage.

M6.

> **Injury** means bodily harm to you which:
>
> (a)   is the direct result of an accident or trauma that occurs while your policy is in force; and
>
> (b)   is not related to Sickness or any other cause.

M5. The LTD Policy contained an exclusionary rider that stated as follows:

> Benefits for loss sustained by the [insured] as a result of the condition(s) named in this section are not payable under the policy/certificate.

M15. The sole condition listed on the rider is "DISEASE OR DISORDER OF THE EAR." M15. One of differences between the two long-term disability policies at issue is that one of them excludes any "DISEASE OR DISORDER OF THE ESOPHAGUS" in addition to an exclusion for ear disease or disorder. M22.

---

[3] The parties did not cooperate in preparing the evidentiary record for their summary judgment motions. The record thus includes many copies of the same documents, attached as more than 50 exhibits to various declarations of the parties' counsel. Where possible, the court has cited documents as they appear in Mutual of Omaha's claim file, excerpts of which appear in several declarations from Ms. Oganessova's counsel. The court cites the claim file according to the numerical identifier that Mutual of Omaha stamped in the lower-right-hand corner of each page, except in cases in which Mutual of Omaha stamped the page upside down, in which case the stamp appears in the upper-left-hand corner of the page. For example, the court uses the notation "M6" to cite the page stamped "MUTUAL-000006."

ORDER – 9

The LTD Policy unambiguously provides coverage for an Injury to the ear (*i.e.*, bodily harm to the ear caused by an accident or trauma) that causes a disability. Putting aside the exclusionary rider, the LTD Policy plainly covers any disability resulting from Injury. The exclusionary rider does not alter that conclusion. An Injury, even an Injury to the ear, is not, by definition, a disease or disorder of the ear. An Injury might cause a disease or disorder of the ear, but that does not change the LTD's Policy's command that disabilities caused by Injury are covered. In the event that an Injury causes a disease or disorder of the ear that causes a disability, Washington's "efficient proximate cause rule" mandates that the disability is covered despite the presence of an excluded cause in the causal chain. *See Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 276 P.3d 300, 309 (Wash. 2012). That rule applies "when two or more perils combine in sequence to cause a loss and a *covered peril* is the predominant or efficient cause of the loss." *Id.* (emphasis in original); *see also Graham v. Public Employees Mut. Ins. Co.*, 656 P.2d 1077, 1081 (Wash. 1983) (explaining that "[w]here a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought, the insured peril is regarded as the 'proximate cause' of the entire loss."). The "efficient or predominant cause" is the cause that "sets into motion the chain of events producing the loss . . . ." *Graham*, 656 P.2d at 1081.

By contrast, if the efficient proximate cause of a disability is a disease or disorder of the ear, then the exclusionary rider eliminates coverage for that disability.

**B.     The Court Cannot Determine On Summary Judgment Whether Ms. Oganessova Suffers From a Disability that Any of Her Mutual of Omaha Policies Cover.**

Applying the interpretation of the LTD Policy to the facts before the court, it is apparent that the court cannot grant judgment as a matter of law. In Ms. Oganessova's version of events, a version that the evidence supports, her accidental fall was the efficient proximate cause of her disabling condition. That fall may have caused a brain

ORDER – 10

1 injury, exclusive of any process related to the ear, which may be the cause of her
2 disabling vertigo. That appears to be the opinion that Dr. Podemski and Dr. Mehlum
3 expressed in their March 2011 letter, which excluded an ear condition as the cause of her
4 vertigo. Alternatively, the fall may have caused an injury to her ear (as Dr. Andrews
5 appears to opine) that has resulted in an ear condition that is the cause of her vertigo. In
6 either case, a covered Injury would be the efficient proximate cause of Ms. Oganessova's
7 disability. On the other hand, a jury could credit Mutual of Omaha's alternate version of
8 the events (one that disregards the opinion of Dr. Andrews), in which Ms. Oganessova's
9 fall did not contribute at all to causing her disability, and the disability is instead the
10 result either of ear conditions that pre-dated the fall or ear conditions that arose after the
11 fall for reasons unrelated to the fall. For example, a jury could credit the expert
12 testimony of Dr. Henson, who opines that Ms. Oganessova's disability is "the result of
13 chronic ear disease, with esophageal reflux resulting in Eustachian tube dysfunction."[4]
14 Engle Decl. (Dkt. # 20), Ex. 6. In that case, her disability would not be covered.

So far, the court has discussed only the terms of the LTD Policy, but that discussion applies equally to the STD Policy. The STD Policy differs from the LTD Policy primarily in that it does not cover disabilities that result from sickness, and in that it provides benefits only for a limited period of disability. Like the LTD Policy, it provides coverage when an insured is "Totally Disabled because of an Injury," but also when an insured is "Partially Disabled because of any Injury." M114. It defines "Injury" in the same way as the LTD Policy, except for the use of "sickness" as a term not defined in the policy, and the inclusion of a final parenthetical clause:

> **Injury** means bodily harm to you which:
> 
>     (a)    is the direct result of an accident or trauma that occurs while your policy is in force; and

---

[4] Dr. Jung's opinion raises the possibility that the proximate cause of Ms. Oganessova's disability is esophageal reflux, which is an excluded cause under one of the long-term disability policies, but not the other. *See supra* n.4.

ORDER – 11

        (b)    is not related to sickness or any other cause (except for sickness caused by the injury).

M113.  That final parenthetical clause makes clear, even without the application of the efficient proximate cause rule, that the STD Policy covers a disability caused by a sickness caused by an Injury.

      The same disputes of fact as to the cause of Ms. Oganessova's disability preclude summary judgment as to whether the STD Policy provides coverage.[5]  The court cannot determine as a matter of law whether Ms. Oganessova's disability was the result of an Injury.

**C.    The Court Cannot Determine On Summary Judgment Whether Ms. Oganessova Is Disabled Within the Meaning of Any Mutual of Omaha Policy.**

      Ms. Oganessova asks the court to determine as a matter of law that she is disabled within the meaning of the LTD or STD Policies.  That is not a question of the cause of her disability, but rather whether she meets the definitions of Total Disability or Proportionate Disability in the LTD Policy, or Partial Disability in the STD Policy.  That is a factual question, and as Mutual of Omaha points out, Ms. Oganessova presented no evidence that suffices to place the answer to that question beyond dispute.  Among other things, Ms. Oganessova's evidence does not address her ongoing medical care beyond 2010, which is a requirement of both Total Disability and Proportionate Disability.  She also does not address whether she is capable of performing work other than her previous occupation, a requirement for compensation for Total Disability or Proportionate Disability that persists longer than 24 months.  Moreover, a jury could credit Mutual of Omaha's evidence portraying Ms. Oganessova as a malingerer, in which case the jury would perhaps conclude that she was not even Partially Disabled within the meaning of the STD Policy.

---

[5] Ms. Oganessova criticizes Mutual of Omaha for not mentioning the STD Policy in the denial letters it sent her.  Whatever the merits of that criticism (the court is aware of no evidence that Ms. Oganessova mentioned the STD Policy to Mutual of Omaha before this litigation began), it is not clear that it makes a difference.  If Mutual of Omaha had sooner acknowledged the STD Policy, it likely would have denied coverage for one of the same reasons that it denied coverage under the LTD Policy – its assertion that an injury did not cause Ms. Oganessova's disability.

ORDER – 12

Ms. Oganessova asks the court to estop Mutual of Omaha from denying that she had a Proportionate Disability or Partial Disability because Mutual of Omaha did not assert as much prior to litigation. She correctly notes that the sole basis for denying coverage that Mutual of Omaha articulated in its three denial letters was that the exclusionary rider applied. She relies on a form of estoppel sometimes referred to as the "mend the hold" doctrine, which prevents an "insurer from changing the basis for avoiding liability after the onset of litigation." *Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d 1235, 1245 (W.D. Wash. 2014) (citing Washington and federal common law). In Washington, the doctrine requires the insured to demonstrate that she either suffered prejudice as a result of the insurer's failure to raise sooner a ground for denying coverage or that the insurer acted in bad faith when it failed to raise that grand sooner. *Id.* (citing *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167, 1171 (Wash. 2000)).[6]

Here, the court cannot determine the application of the mend the hold doctrine as a matter of law. Although the court finds no evidence that Mutual of Omaha challenged whether Ms. Oganessova met the definitions of Total Disability or Proportionate Disability, the court cannot make an as-a-matter-of-law determination of prejudice or bad faith. A finder of fact could conclude that Ms. Oganessova suffered no prejudice, because she knew that if she could overcome Mutual of Omaha's application of the exclusionary rider, she would still have to demonstrate the extent to which she was disabled. The court notes, moreover, that there is no evidence that Ms. Oganessova asked Mutual of Omaha to determine whether she met the definition of Proportionate Disability (or Partially Disabled) despite its denial of coverage. For similar reasons, it is not apparent that Mutual of Omaha acted in bad faith. It is possible, for example, that in the months following Ms. Oganessova's onset of vertigo, it conceded that she met the

---

[6] Washington has, by regulation, codified a version of the mend the hold doctrine. WAC 284-30-380(1) ("The insurer must not deny a claim on the grounds of a specific policy provision, condition, or exclusion unless reference to the specific provision, condition, or exclusion is included in the denial."). The regulation does not, however, act to estop an insurer from belatedly asserting a new basis for denying a claim. *Hayden*, 1 P.3d at 1171.

ORDER – 13

definition of Total Disability or Proportionate Disability, and thus felt it unnecessary to address the issue when it was asserting a basis for denying all coverage, regardless of the extent of Ms. Oganessova's disability.

**D.      The Court Will Not Resolve Ms. Oganessova's Extracontractual Claims on Summary Judgment.**

The court now turns from Ms. Oganessova's breach-of-policy claims to her claims for extracontractual liability. She claims that Mutual of Omaha acted in bad faith and that it violated IFCA.

Bad faith claims and IFCA claims are similar. An insured's assertion of bad faith against her insurer is a tort claim. *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 503 (Wash. 1992).[7] A denial of coverage is in bad faith if it is unreasonable, frivolous, or unfounded. *Overton*, 38 P.3d at 329-30. Violation of Washington's insurance regulations is evidence of bad faith. *See Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 935 (Wash. 1998). IFCA gives a cause of action to a first-party insured against an insurer who "unreasonably denie[s] a claim for coverage or payment of benefits." RCW § 48.30.015(1).

Ms. Oganessova's motion for summary judgment, however, asks only for a ruling that Mutual of Omaha "violated industry standards and Washington's unfair claims settlement practices regulations" in five specific ways. Mutual of Omaha asks the court to dismiss her extracontractual claims as a matter of law.

Mutual of Omaha's request for summary judgment as to the extracontractual claims is not well taken. That request is premised largely on its assertion that it correctly denied coverage, an assertion that a jury must accept or reject. Putting that aside, there is ample evidence from which a jury could conclude that Mutual of Omaha acted in bad

---

[7] In her complaint, Ms. Oganessova did not allege the tort of bad faith, but rather a breach of the covenant of good faith and fair dealing inherent in insurance policies (and all other contracts). She reasserted that claim in her motion for summary judgment. Dkt. # 19 at 1. Mutual of Omaha, however, interpreted that claim as a tort claim in its own motion for summary judgment, Dkt. # 17 at 2, 10, as did Ms. Oganessova in her opposition to that motion, Dkt. # 34 at 11-12.

ORDER – 14

faith. A jury could conclude, for example, that Mutual of Omaha unreasonably failed to obtain an opinion from a qualified medical provider until it consulted Dr. Andrews in 2013. It could conclude that Mutual of Omaha had no adequate basis to dismiss the opinions of Dr. Podemski and Dr. Mehlum. It could conclude that Mutual of Omaha did not conduct a complete or unbiased investigation, and instead relied on dubious evidence both that Ms. Oganessova's vertigo predated her fall and that Ms. Oganessova exaggerated or faked her symptoms.

As to Ms. Oganessova's request for summary judgment, the court questions its relevance. Rather than requesting summary judgment as to even a single instance of bad faith or a violation of IFCA, she asks the court to find various violations of "industry standards" and Washington insurance regulations as a matter of law. Even if the court were to grant her request, it would not establish Mutual of Omaha's liability for anything. Evidence of violation of industry standards is perhaps relevant to whether an insurer acted in bad faith or violated IFCA, but it is not invariably sufficient to prove bad faith. Evidence of violation of Washington insurance regulations is evidence of bad faith, *see Coventry Assocs.*, 961 P.2d at 935, but it does not invariably prove bad faith. To the extent that Ms. Oganessova believes that proof of violation of an insurance regulation is sufficient to prove a violation of IFCA, she is mistaken. Regulatory violations matter only in deciding whether to enhance damages under IFCA or to award attorney fees.[8] RCW 48.30.015(5) (stating that violation of insurance regulations is a "violation for purposes of subsections (2) and (3) of this section," which relate to enhanced damages

---

[8] By contrast, proof of a violation of Washington insurance regulations, coupled with proof of a resulting injury to business or property, is sufficient to prove a violation of Washington's Consumer Protection Act. *Indus. Indem. Co. of the N.W. v. Kallevig*, 792 P.2d 520, 530 (Wash. 1990). Ms. Oganessova does not assert a CPA claim.

ORDER – 15

and attorney fees); *Seaway Props., LLC v. Fireman's Fund Ins. Co.*, No. C13-633RAJ, 2014 U.S. Dist. LEXIS 55998, at *33-36 & n.5 (W.D. Wash. Apr. 22, 2015).[9]

The court declines to decide whether Ms. Oganessova has proven violations of "industry standards" or Washington insurance regulations as a matter of law.  The court is not convinced that a ruling on these issues would make any difference in the evidence presented at trial.  Moreover, Ms. Oganessova has not attempted in her motion to show that she was damaged as a result of these alleged violations, a necessary element of a bad faith claim.  A jury may well conclude that Ms. Oganessova's damages arise solely from Mutual of Omaha's denial of coverage, as opposed to any violation of "industry standards" or insurance regulations.  The court declines to sift through more of the parties' evidence in search for regulatory violations that might ultimately be irrelevant at trial.

Both parties have offered "expert" testimony on whether Mutual of Omaha's claims handling in this case complied with the law.  Mutual of Omaha moved to strike the declarations of Patrick LePley and John Sargent because they are riddled with legal conclusions, which are beyond the province of expert testimony.  Ms. Oganessova moved to strike the report of Barbara Mueller, who offers similar testimony on Mutual of Omaha's behalf, on the ground that she was not properly disclosed as a rebuttal expert.  Because the court does not rely on evidence from Mr. LePley, Mr. Sargent, or Ms. Mueller in resolving these motions, it need not address the parties' motions to strike.  To the extent that any party believes the court will permit "expert" testimony in the form of legal conclusions, that party is mistaken.  To the extent that Ms. Oganessova believes that

---

[9] Ms. Oganessova's counsel will note that the *Seaway* decision and several other district court decisions the court cites are not "published" in a hard-copy official reporter.  Counsel chided Mutual of Omaha for violating "Ninth Circuit rules" by citing the "unpublished" decisions of a federal district court.  Pltf.'s Reply (Dkt. # 43) at 9 n.8 (citing Fed. R. App. P. 32.1).  The rule on which counsel relies governs procedures only "in the United States courts of appeals."  Fed. R. App. P. 1(a)(1).  Citation of "unpublished" district court cases is commonplace, and the court is aware of no prohibition on the practice.  *See Cont'l Western Ins. Co. v. Costco Wholesale Corp.*, No. C10-1987RAJ, 2011 U.S. Dist. LEXIS 90866, at *3-10 (W.D. Wash. Aug. 15, 2011).

ORDER – 16

any expert testimony whose necessity was reasonably foreseeable is not rebuttal testimony, the court disagrees. *See Theoharis v. Rongen*, No. 11-1345RAJ, 2014 U.S. Dist. LEXIS 09086, at *7-12 (W.D. Wash. Jul. 18, 2014).

## IV. CONCLUSION

For the reasons stated above, the court DENIES Mutual of Omaha's motion for summary judgment (Dkt. # 17) and DENIES Ms. Oganessova's motion for partial summary judgment (Dkt. # 19). The court orders the parties to file motions in limine in accordance with Local Rules W.D. Wash. LCR 7(d)(4), except that they shall file their motions no later than noon on November 13, they shall file oppositions no later than noon on November 20, and they shall note them for November 20 as well.

Trial will begin on December 1. The parties are on notice that they have a maximum of eight trial days (December 1-5, December 8, and December 11-12) to select a jury and present opening statements, evidence, and closing arguments. The court will allocate trial time evenly between the parties.

DATED this 6th day of November, 2014.

_____

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 17